### Ex parte DeMARCOS.

### No. 2914.

District Court of the United States for the District of Columbia.

April 4, 1946.

[5] Act of June 25, 1938, c. 676, § 1 et seq., 52 Stat. 1060, 29 U.S.C.A. § 201 et seq.

[6] Act of July 5, 1935, c. 372, § 1 et seq., 49 Stat. 449, 29 U.S.C.A. § 151 et seq.

232

James J. Laughlin, of Washington, D. C., for petitioner.

Edward M. Curran, U. S. Atty., and John P. Burke, Asst. U. S. Atty., both of Washington, D. C., for respondent.

MORRIS, Justice.

The petitioner by writ of habeas corpus seeks release from custody of Dr. Winfred Overholser, Superintendent of Saint Elizabeths Hospital, to which hospital he was committed by an order of this Court, dated May 14, 1940, having been found to be of unsound mind, pursuant to the provisions of law for such determination in the District of Columbia. Previously the petitioner had been transferred from the Provincial Mental Hospital at Ponoka, Province of Alberta, Dominion of Canada, to Saint Elizabeths Hospital, in the District of Columbia, in conformity with the provisions of an act entitled "An Act To provide for the repatriation of certain insane American citizens," approved March 2, 1929, 24 U.S.C.A. § 196a. He was admitted to Saint Elizabeths under that commitment on April 5, 1939.

The petitioner has on numerous occasions sought release from that institution by petitions for writs of habeas corpus on the ground that he is of sound mind and may not lawfully be longer detained. In one such proceeding, by an order entered as of December 6, 1944, he was found by the Court to be of sound mind and discharged from custody. On appeal from this action, the United States Court of Appeals directed the petitioner to be remanded to the custody of the respondent herein pending the outcome of the appeal. Having left the District of Columbia and returned to his native State, Tennessee, the petitioner was there taken into custody pursuant to a criminal charge (subsequently nolle prossed), for which he was indicted in the District of Columbia after his departure for Tennessee, and he was thereupon returned to this jurisdiction. The Court of Appeals reversed the action of this Court discharging the petitioner on the ground that, pursuant to the opinion in Dorsey v. Gill, App.D.C., 148 F.2d 857, 865, decided February 26, 1945, "in no case of a person held in St. Elizabeths because of insanity should a judge order his release, unconditionally, in a habeas corpus proceeding." In Dorsey v. Gill, decided after the action of this Court above mentioned and before the decision reversing such action, it was clearly pointed out that —"Habeas corpus is available, not for the purpose of determining a petitioner's mental condition, but, instead, as a method of initiating an appropriate procedure for that purpose; * * * if a petitioner was originally committed in a proceeding, properly commenced and carried out, but the judge, to whom the petition for habeas corpus is presented, is satisfied that a sufficient showing of present sanity has been made, he should, in this case, * * * order that the proceedings be reopened and a re-examination made to determine petitioner's present mental condition."

Although this question was not passed upon in the hearing on the writ of habeas corpus, because it was not then known to be the proper procedure, the Court of Appeals considered that the only question before the Court in that case was whether the evidence raised a doubt as to the validity of the judgment of the hospital staff sufficient to require the reopening of commitment proceedings, and held that nothing in the record in that case raised sufficient doubt as to petitioner's insanity to justify such reopening.

In the hearing on the present writ of habeas corpus numerous witnesses were examined, much testimony (799 pages) was taken, and voluminous exhibits were admitted. I consider, under the authorities above mentioned, that the narrow question before me is whether or not, in the light of the evidence additional to that which was before the Court in the previous hearing, the record raises sufficient doubt as to petitioner's insanity at the present time to justify reopening the commitment proceedings, and thus referring such issue to the Commission on Mental Health for their consideration and action pursuant to the applicable statute.

The mental disease with which the petitioner is said by the two psychiatrists testifying as to his unsoundness of mind to be afflicted is that which is known as true paranoia. That term, as defined by the two psychiatrists mentioned, and also by those who testified that the petitioner is of sound mind, means a chronic psychosis characterized by systematized delusions; false ideas that are systematized and not amenable to reasoning. The witnesses testifying on behalf of the respondent insist that such a disease is incurable. There is medical testimony to the contrary, at least in so far as improvement is concerned, though the principal burden of the psychiatrists on behalf of the petitioner is that he is not a paranoiac. One of these latter witnesses made a recent examination of the petitioner and did not testify in the previous case. In the present hearing lengthy testimony of the petitioner was given, which was not before the Court in the previous case, and also numerous lay witnesses who have had much opportunity to observe the petitioner. Certain documentary exhibits have been introduced which have not heretofore been considered.

There are certain facts in this case as to which there can be no dispute. The petitioner has had a most remarkable capacity for getting into difficulties, some of them very serious, during his entire life. He ran away from home at the age of 8 years because he was whipped by his father. He came into collision with the civil authorities while he was a non-commissioned officer during the Spanish American War. He received a discharge "without honor" when his military unit was demobilized because he was then in the hands of the civil authorities charged with discharging firearms across a highway. He came into difficulties with the Canadian authorities in the instance of two assault charges and finally was convicted in that jurisdiction of manslaughter. It is not the province of this Court in this proceeding to retry those cases. It should be noted, however, that the petitioner was fully heard on his explanations with respect to them.

After running away from home, his life, with the exception of comparatively short periods, has been one of movement. He has undoubtedly taken advantage of opportunities to become educated, and he has an unusually wide range of knowledge. That he is highly intelligent is not only conceded, but asserted, by all who have examined him. That he is egotistical to a large degree is beyond doubt. That he resents heartily what he considers to have been injustices to him is quite evident. At least one of the delusions he is said to entertain is attributable to certain of these characteristics. Having had the experiences which he has had with the law of habeas corpus, he has much greater knowledge of that subject than most laymen. Unfortunately, however, his knowledge of that subject is not as complete as he thinks it is. Believing that it was the inalienable right of an American citizen to be brought before a court when a petition for a writ of habeas corpus is finally disposed of, which in most cases it is, he felt that he had been arbitrarily and unjustly dealt with when one of his petitions for such writ was dismissed without his presence in court being required. That feeling of resentment persisted until it was explained to him that the disposition of the petition was made by the court upon the return of a rule to show cause why the writ should not issue, in which instance the presence of the petitioner is not required. He is a voluble talker and a more voluble letter writer. I am quite convinced that the uncooperative attitude of the American Vice Consul, at Edmonton, Alberta, with whom he corresponded while he was in Canadian institutions, was the result of an understandable irritation at what that official considered an unnecessary volume of correspondence. Certain letters that he has written while at Saint Elizabeths, containing statements revealing his egotism and strong tendency toward exaggeration were considered by the psychiatrists at that institution to be strong evidence of the systematized delusions with which they

are convinced he is afflicted. One of these letters appears in the margin of the opinion of the Court of Appeals which has been mentioned.

All of these things may be indicative of unsoundness of mind, but the psychiatrists say that in and of themselves they do not constitute true paranoia, but rather show the persistence of the systematized delusions which had their origin in his difficulties in Canada. The systematized delusions of the petitioner relate, according to the psychiatrists, primarily to the following episodes:

(1) An exaggerated notion of the part played by him in certain police work in Vancouver in 1926, concerning which he testified during the course of a police inquiry in that city in 1928.

(2) His difficulties with the officials, principally the warden, during his incarceration in the Saskatchewan Penitentiary and his feeling of persecution at their hands, which he attributed to the part he took in an investigation of abuses in the administration of the welfare relief fund in Vancouver following his police work there, and to his determination to appear as a witness before the Royal Commission then conducting an investigation of the penal institutions in Canada, to which Commission he intended to relate certain conditions existing at the penitentiary, including a shortage in the accounts which he had discovered.

(3) His difficulties with the officials of the Provincial Mental Hospital, at Poneka, and his feeling of persecution at their hands, which he attributed to the influence of the warden of the Saskatchewan Penitentiary, whom he says desired to discredit him and to keep him from appearing as a witness before the Royal Commission.

I do not believe that there is much doubt that the petitioner would not now be confined as a paranoiac were it not for what the psychiatrists consider to be delusions respecting the matters above mentioned, as the information in the file of the Department of Justice, studied and considered by one of the psychiatrists testifying as to the unsoundness of petitioner's mind, related primarily to these matters. This seems to be quite evident from the following excerpt from his testimony:

"True paranoia is a chronic, incurable disease of the mind which is characterized primarily by highly systematized delusions of persecution.

"The personality is well preserved. The individual is usually a very intelligent individual. He is able to reason so that his expressions seem to have a lot of logic, but nevertheless he expresses many delusions of persecution. These delusions are of such a high type, however, that one must do a lot of collateral investigation to determine just how much such an individual is delusional and how much is based on fact.

"This particular case, I might say, the Department of Justice made a very lengthy study of his case in which a great deal of effort and time was expended in investigating his record—

* * * * *

"As I was saying, the Department of Justice made a very thorough investigation of this individual's past life, going back to his boyhood.

"This was done in order to determine whether evidence could be obtained which would be admissible in court, possibly more or less to demonstrate which of the things Mr. DeMarcos had stated were delusional, and which were, as a matter of fact, based upon fact.

"I would like to state this: That I have examined the records of the Department of Justice in great detail. I have poured over them for hours, and many of the statements contained therein are, in my opinion, evidence that a great many things which Mr. DeMarcos has said are delusional ideas, as has been elicited by myself and other physicians of St. Elizabeths Hospital."

The witness is correct in saying that much of the file accumulated by the Department of Justice and studied by him would indicate the conclusion that the petitioner was not engaged in the police work which he said he was and, therefore, the part he played in the police inquiry in Vancouver was indeed largely, if not entirely, delusional. In such file, however, there does appear a letter dated September 8, 1939, from the then City Solicitor of the City of Vancouver to the American Consul General in that city, in which reference is made to the testimony of the petitioner in the police inquiry which covered approximately 110 pages of transcript. The statement is also made in such letter that such inquiry resulted in the reorganization of the police force: Chief of Police Long was demoted to the rank of inspector and subsequently superannuated and a new chief was appointed; some of the older

members of the force were placed on superannuation. It is stated that there were no dismissals from the police department as a result of the investigation; there were no criminal prosecutions instituted; and no persons were imprisoned.

There also appears in said file a certificate furnished by A. Franklin Amor, dated March 27, 1940, and transmitted by the American Consul General at Vancouver to the Secretary of State of the United States. In this certificate the declarant states that he was then supervisor of the records of the Vancouver Police Department. At the time of the inquiry of Commissioner R. S. Lennie, K. C., into the affairs of the Vancouver Police Department in 1928, he was Secretary of the Vancouver Police Commission. As a result of the inquiry six police officers were suspended, of which number two were afterwards dismissed. Three of those suspended resigned and one was reduced from detective to patrolman. One of the dismissed officers and two of the resigned officers later were reinstated as members of the police department. No mention in this certificate is made of the petitioner's participation in the police inquiry. Of course, it may be that such question was not put to him. This is somewhat curious, however, in that the declarant was present at the taking of the testimony of the petitioner, and, upon request of the Commissioner, produced certain written reports made by the petitioner to the Chief of Police, to whom the declarant was then secretary. He unquestionably knew that the petitioner made such reports by arrangement with the Chief of Police under the pseudonym of F. A. Wallace, although he was known to the Chief of Police and to his secretary as DeMarcos. Reference to the transcript of the petitioner's testimony given on May 28–29, 1928, before the Commissioner conducting the police inquiry in Vancouver makes this very clear.

The gist of petitioner's evidence in that inquiry was that he was a policeman in Alberta for some years and went to Vancouver in 1926 with a letter from Colonel Bryan, head of the Alberta Police, addressed to Henry W. Long, the Chief of Police at Vancouver. This letter recommended him very highly, and in May, 1926, Chief Long engaged him as a special undercover officer to check up on the work of his men. He so acted until sometime in July, 1926. In his evidence he gave direct testimony against Deputy Chief Dan Leatherdale and a number of other prominent members of the police force. Some he charged with drunkenness on duty; others with protecting bootleggers, gambling houses and bawdy houses. His main complaint against Chief Long was that, after he reported such misconduct of the officers to him, he took no action to discipline the men or enforce the law. This, he stated, was explained by Chief Long to him as being due to the views held by the Mayor. He testified concerning many reports made by him in writing, some of which were produced, and many verbal reports concerning specific addresses or places which he charged were being allowed to operate after such reports. There was introduced in evidence in that inquiry, and read into the record, a letter from the Chief Constable's Office, Vancouver, British Columbia, dated July 12, 1926, addressed to whom it may concern, and stating, "This is to certify that the bearer, Mr. J. R. DeMarco, was employed in this Department as a special constable from May 1926 to July 15, 1926, during which time his services were satisfactory. Signed H. S. Long, Chief Constable."

The petitioner has stated in one of his letters, which has been referred to above, that he withstood successfully the cross-examination of "fourteen of Canada's crack lawyers," who "pounded themselves into a ludicrous pulp." This indeed may be hyperbole, but the transcript of the testimony does clearly reveal that he was subjected to most vigorous, and frequently sarcastic, cross-examination by nine counsel in the case, with an occasional question by the Commissioner. During his examination Chief Long, Sargeant MacLaughlin and Mr. Amor occasionally interspersed comment. It must also be candidly conceded that such cross-examination did not shake his testimony in the least. That he is not even a little modest about what was accomplished by the inquiry is hardly to be doubted, but that substantial results were accomplished seems clear from the letter of the city attorney and the certificate of Mr. Amor, which have already been mentioned. At least one thing would seem indisputable, that his testimony could, as he claims it did, earn for him the very generous ill will and enmity of those against whom he testified, and others who might have an identity of interest with them. Although this transcript of evidence has been referred to in previous hearings, so

far as I can ascertain it was not a part of the evidence in the previous hearing in this Court which was reviewed by the Court of Appeals.

That the petitioner is a true follower of Braggadocio is more than evident from statements in one of his letters to the effect that the ·daily papers in Vancouver, Calgary and Edmonton agreed that he was the most outstanding and the most convincing witness in the history of the Canadian judiciary. It is true, however, that the Vancouver Morning Star, the only Canadian newspaper current with the police inquiry from any of the cities mentioned now available here, gave rather full and accurate coverage of the testimony given by the petitioner, and by witnesses subsequent to him making reference to the petitioner's testimony. This appears from excerpts from several issues of that newspaper over a period from May 24, 1928, to July 5, 1928, inclusive, on pages 615–627, 637–649 and 651 of the transcript of the instant hearing. No editorial comment was introduced in evidence.

Perhaps the most important set of beliefs in which it is thought that the petitioner's ideas are highly, if not wholly, delusional is the conviction he has that Lieutenant Colonel W. H. Cooper, the warden of Saskatchewan Penitentiary after he became an inmate there was vindictive toward him and caused the difficulties which he suffered in that institution and later in the Provincial Mental Hospital, at Ponoka, to which institution he is convinced the warden caused him to be sent. Prior to the time that both the petitioner and Cooper went to the Saskatchewan Penitentiary, the petitioner testifies that Cooper, then a resident of Vancouver, was in some capacity connected with the welfare relief fund of that city and assisted the head of that department, Dr. George D. Ireland. He further testifies that he was engaged, subsequent to his police work there, which has been referred to, in an investigation concerning certain alleged abuses in the administration of that fund; that he operated through three agents or assistants, and their work continued over a period from before Cooper commenced his work with the relief fund, until possibly a year or more later. The petitioner further testifies that, as a result of such investigation, it was discovered that certain persons connected with the relief fund, including the head of that depart-

ment, Dr. Ireland, were engaged in a conspiracy of furnishing meal tickets to certain restaurants for nonexistent persons and receiving a major part of the monies paid out of the welfare fund for such tickets. He states that no adequate evidence was secured respecting Cooper, but that he lost his position as a result of exposure and conviction of Dr. Ireland, the head of the department, and the petitioner is convinced that Cooper had guilty knowledge and was active in this affair. The petitioner states that he signed with his right name approval of the written reports made by his assistants, and it was generally known that the petitioner was active in the investigation. Beyond the fact that the records disclose that Cooper was separated from his position as warden of the British Columbia Penitentiary on February 17, 1928, and was engaged in private business in Vancouver from then until June 1, 1930, on which date he was appointed City Relief Officer for the City of Vancouver, holding that position until he was again appointed warden of the British Columbia Penitentiary on June 30, 1932, there is no corroboration of the testimony of the petitioner in this particular connection. It would seem, however, that some investigation could without very great difficulty disclose matters which would either substantiate or refute the petitioner's statements. In any event, when the petitioner was convicted of manslaughter at Edmonton on January 16, 1934, and sentenced to life imprisonment, he was committed to the Saskatchewan Penitentiary. In February 1935 Cooper was transferred from the British Columbia Penitentiary to the Saskatchewan Penitentiary as warden. The petitioner claims that shortly thereafter he found that his mail was being interfered with, and when he protested to the warden he was reminded of the trouble which he had caused him growing out of the investigation of the welfare relief fund, and the warden told him in substance that he would have his turn now. Sometime thereafter, the petitioner testifies, he discovered through certain inmates working on the books of account at the penitentiary that substantial shortages existed. He made it known to the warden that he intended to testify with respect to this and other prison abuses before a Royal Commission which had been appointed to investigate the penal institutions of Canada in 1936, and which was then engaged in such investigation. Shortly thereafter he

was placed in solitary confinement and all privileges taken from him. He was informed that, if he would agree not to so testify, he would be released from such solitary confinement, but he flatly refused this offer. It was subsequent to, and he insists because of, this that he was removed on the certificate of a prison physician to the Provincial Mental Hospital at Ponoka on December 29, 1936. This was five months before the Royal Commission appeared at Saskatchewan Penitentiary, before which Commission he was not permitted to appear. While there is no corroboration of the petitioner in respect of his treatment by the warden of Saskatchewan Penitentiary, if one is to believe that the conditions existed in that institution which the Royal Commission in its report, dated April 4, 1938, most explicitly found to exist [1], and which the petitioner said did exist; and, if one is to believe that the warden was the kind of person which the Royal Commission in its report found him to be [2], and which the petitioner also said that he was, it is more likely than not that the warden was seeking to discredit the petitioner, if not actually to prevent him from testifying before such Royal Commission. In that view, the probability of truth is heavier on the side that the petitioner's beliefs concerning his treatment by the warden were more factual than delusional. Although the report of this Royal Commission has been heretofore referred to, it was not, nor was any excerpt therefrom, part of the evidence in the previous hearing in this Court which was reviewed by the Court of Appeals.

There are numerous other beliefs expressed at various times by the petitioner which are considered delusional by the psychiatrists who believe him to be of unsound mind. These, however, as I understand their testimony, are the development and persistence of the more basic, or cen-

---

[1] Report of Royal Commission To Investigate The Penal System of Canada, Chapter XXVIII, pp. 322–331, inclusive, Saskatchewan Penitentiary.

[2] Report of Royal Commission, supra, pp. 329–330.
Warden

Lt.-Col. W. H. Cooper was first taken into the penitentiary service in August, 1920, as a temporary guard at St. Vincent de Paul Penitentiary. In the same month he was appointed to the permanent service, and, in October, promoted assistant to the warden. On the same date he was transferred and permanently appointed warden of Manitoba Penitentiary. On September 1, 1923, he was transferred to the position of warden at British Columbia Penitentiary. On February 17, 1928, he was retired to promote efficiency and harmony, and was paid a gratuity of $1,484.47.

This officer's retirement followed a lengthy investigation by one of the inspectors. A report was made by the inspector, and the Minister of the day concurred in the conclusion of the report and directed that the necessary steps be taken for his retirement.

In January, 1932, the wardenship of the British Columbia Penitentiary became vacant and the position was advertised in the usual way. On January 25, a letter was received by the Department from the Secretary of the Civil Service Commission requesting information as to whether the position could not be filled by promotion within the Department. The Department's reply to the letter does not appear on the files of the Penitentiary Branch. No action appears to have been taken until May, 1932, when the Department advised the Secretary of the Civil Service Commission, that, if Lt.-Col. Cooper was found to be the successful candidate in the competition, the Department would not object to his appointment because of anything concerning his previous employment in the service.

On May 18, the Secretary of the Civil Service Commission wrote a letter to the Department asking to know the reason why Lt.-Col. Cooper had been retired from the service. The Secretary was advised that he had been retired under section 32, paragraph 3 of the Penitentiary Act. It does not appear that he was advised of the reasons.

On May 30, Lt.-Col. Cooper was appointed permanent warden of the British Columbia Penitentiary. In February, 1935, he was transferred to the same position in Saskatchewan Penitentiary. The serious conditions indicated elsewhere in this report that exist at Saskatchewan Penitentiary are, in a large measure, due to the mismanagement of the warden.

He does not appear to be able to command the respect of either the officers or the prisoners; he carries petty militarism to the extreme, and he appears to be constitutionally unfitted for the office he occupies. He is arrogant and over-bearing in his manner toward the members of his staff and yet inefficient in his administration of the institution.

Having regard to his long experience in the penitentiary service, your Commissioners do not believe that this officer is likely to show such improvement as would justify his retention in the service.

tral, delusions. If the beliefs of the petitioner concerning his participation in police work in Canada, as to which he testified in the police inquiry, and his beliefs respecting his treatment by the warden of Saskatchewan Penitentiary, and the causes of such treatment, are not "delusional," but are "as a matter of fact based upon fact," then it would seem by definition that there is not a "chronic psychosis, characterized by systematized delusions; false ideas that are systematized and not amenable to reasoning," which constitute true paranoia. These beliefs just mentioned, as I understand the testimony of the psychiatrists, are the alleged delusions from which other delusions are said to stem, around which they are systematized. There is nowhere the contention that certain paranoid characteristics, which may evidence other mental diseases than true paranoia, are sufficient in the case of the petitioner to show that he is afflicted with any such other mental disease, because there are lacking other characteristics and indicia necessary to establish any mental disease other than true paranoia. The question presented, then, appears to be whether the beliefs of the petitioner here discussed are founded only upon a "modicum of fact," and are, therefore, delusional, or whether they are as a matter of fact based upon substantial fact, such as would induce such beliefs in the mind of a reasonable person. Upon the answer to that question depends whether the petitioner should be retained in the custody of the respondent, or discharged therefrom.

There can be no doubt that a heavy responsibility rests upon the respondent and members of the staff of Saint Elizabeths Hospital to protect the public from the release at large of a person whom they are convinced would in that situation, because of his unsoundness of mind, be a menace to others, a danger to himself, bring about the possibility of the commission of crime, or jeopardize the public peace. There is no doubt that the respondent and his staff are convinced that the release of the petitioner would result in one, or more, of these dangers. In that view, it is their duty to do all that can properly be done to maintain custody of the petitioner, which they consider to be in the public interest. It is, however, also of high importance that, if the petitioner be not of such unsoundness of mind as to create by his release the dangers mentioned, he be not un-lawfully restrained of his liberty. It is of grave concern, not only to the petitioner, but to the public as well, and to the integrity of the judicial processes, that his rights, whether he be of sound or unsound mind, be dealt with scrupulously, so that he be given no just cause to believe that he has been treated unfairly.

While the question of the soundness or unsoundness of mind of the petitioner cannot be settled in these proceedings, the Court of Appeals has happily pointed the way. From the evidence adduced in this hearing, I am convinced that a sufficient showing has been made by the petitioner respecting his present mental condition to justify and require a fresh and thorough re-examination of such mental condition by the Commission on Mental Health in accordance with the applicable statute. In this view, it is my duty to reopen the original commitment proceedings for the purpose stated. It is so ordered.